UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 10-62061-CV-HURLEY/HOPKINS

CERTAIN INTERESTED UNDERWRITERS
AT LLOYD'S, LONDON,

    Plaintiffs,

v.

AXA EQUITABLE LIFE INSURANCE
COMPANY, et al.,

    Defendants.
_____/

### ORDER GRANTING PLAINTIFFS' MOTION FOR FINAL SUMMARY JUDGMENT, AND DENYING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

**THIS CASE** is before the Court upon Plaintiffs' Certain Interested Underwriters at Lloyd's, London ("Lloyd's") Motion for Final Summary Judgment [ECF No. 120], and Defendant The GIII Accumulation Trust's ("GIII") Motion for Partial Summary Judgment on Coverage [ECF No. 117]. The motions were fully briefed, and the Court has had the benefit of oral argument. Upon review, the Court will grant summary judgment in Plaintiffs' favor.

### BACKGROUND

The resolution of this case turns on the actions of an insurance broker, and the interpretation of his professional liability policy. Steven M. Brasner worked as an independent insurance broker, soliciting clients and selling life insurance policies on behalf of several insurance companies, including the AXA Equitable Life Insurance Company ("AXA"). To

protect him from liability for negligence or mistakes in the performance of his work, Brasner procured a professional errors and omissions policy from Lloyd's.

In the summer of 2006, Brasner solicited Geoffrey Glass as a prospective client. To facilitate the purchase of two life insurance policies, one for ten and another for twenty million dollars, Glass created two insurance trusts, naming his brother Walter and the GreatBanc Trust Company as joint trustees. Both applications stated that Geoffrey Glass had an annual income of one million dollars and a net worth of fifty million dollars.[1] Additionally, both applications had a box checked "no" to the question, "Do you, the owner, intend to use or transfer the policy for any type of pre-death financial settlement, such as viatical settlement, senior settlement, life settlement, or for any other secondary market?"

AXA processed the Glass applications and issued both policies on February 6, 2007. The next month, the trusts sold both policies to GIII. In connection with the sale, Brasner executed an "agent certificate" which, among other things, stated

> Each document submitted to the Insurer by the Agent on behalf of Seller with respect to the Policy, including, but not limited to, preliminary policy applications, medical records and other documents containing information with respect to Seller or the Agent, were, to the knowledge of the Agent, true and accurate as of the date of delivery.

In fact, however, Brasner was far from truthful; he falsified insurance applications on a regular basis. His purpose was to induce insurance companies to issue life insurance policies which would be held beyond the contestability period and then offered for sale on the secondary

---

[1] GIII, in opposition to Brasner's motion for summary judgment in an underlying case, *AXA Equitable Life Insurance Co. v. Infinity Financial Group, LLC*, No. 08-cv-80611, submitted an excerpt from Geoffrey Glass's deposition. There he stated that the handwriting on the insurance application was not his, that the one million and fifty million figures were not correct, and that he had not authorized anyone to make these representations on his behalf.

market, *i.e.*, repurchased and maintained as investment vehicles by someone other than the named insured. When the scheme was discovered, AXA and other insurance companies instituted civil actions to recover paid commissions and rescind the fraudulently-induced policies. More important for the resolution of this case, the State of Florida initiated criminal proceedings against Brasner, charging him in a 22-count information with insurance fraud, grand theft, and engaging in a scheme to defraud. Brasner ultimately entered an *Alford*[2] plea of guilty in his best interest to three crimes, two of which have direct relevance to this case.

Brasner pled guilty to Count 13, which charged a violation of Fla. Stat. § 817.234(1)(a)3. It alleged that Brasner had defrauded AXA by providing materially false information in insurance applications. He also pled guilty to Count 21, which charged a violation of Fla. Stat. §817.034(4)(a). It alleged that Brasner had engaged in an ongoing scheme to defraud one or more persons by making false or fraudulent representations and, as a result, obtained $50,000 or more from the victims.

In an entry-of-plea proceeding conducted in open court in the presence of Brasner and his attorney, the prosecutor presented the following statement of facts:

> This is a course of conduct that takes place between January 1, 2006 to December 31, of 2007. There are three insurance companies that are involved, Trans America, Citizens and AXA. In its simplest terms, if the State were to proceed to trial, we would prove by testimony and physical evidence that the defendant enlisted elderly people wherein he supplied information on insurance applications that was not known to them. In that course, the insurance policies were placed. He derived significant commission income. That occurred here in Palm Beach County.

---

[2] *See North Carolina v. Alford*, 400 U.S. 25 (1970).

The negotiated disposition called for a term of probation with special terms. Among the terms set forth in a written document, signed by Brasner and his attorney, were the following: "No work in the insurance industry whatsoever. Defendant may continue to receive income from <u>prior</u> placed insurance <u>renewal</u> income. Excluded from renewal income AXA policies for Walter & Geoffrey Glass, Altman, Gelch & Sciolino." (Emphasis in original). These special conditions of probation were orally restated before the trial judge, after which Brasner formally entered his pleas and was adjudicated guilty.

In the ensuing time period, two civil actions were instituted. AXA sued Brasner for disgorgement of the fraudulently obtained commissions. This case was referred to arbitration and has since been dismissed. GIII brought suit against Brasner, contending that his agent certificate contained negligent misrepresentations. This case resulted in a consent judgment against Brasner for $1,450,000 and an assignment of Brasner's right to sue Lloyd's for breach of its insurance contract.

## JURISDICTION

The Court has subject-matter jurisdiction because the parties, including each of the Lloyd's syndicates participating in the subject insurance policy, are completely diverse, and the amount in controversy exceeds $75,000. 28 U.S.C. § 1132. Venue is proper because the underlying facts occurred in the Southern District of Florida. 28 U.S.C. § 1391.

## DISCUSSION

### LEGAL STANDARD

A movant may obtain summary judgment if it "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

4

56(a); *Celotex Corp. v. Cattrett*, 477 U.S. 317, 322 (1986). The movant bears the burden of meeting this requirement. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). The movant may discharge this burden by "pointing out to the district court [] that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. If the movant discharges its burden, the burden then shifts to the nonmoving party to establish that there is a genuine dispute of material fact. *Id.* at 324. "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990). If the nonmoving party fails to make a sufficient showing, the movant is entitled to a judgment as a matter of law. *Celotex*, 477 U.S. at 323.

When deciding summary judgment, the Court may look to materials in the record such as depositions, documents, affidavits or declarations, and admissions. Fed. R. Civ. P. 56(c)(3). The Court reviews all evidence and factual inferences in the light most favorable to the non-moving party, and resolves all reasonable doubts about the facts in favor of the non-movant. *Morton v. Kirkwood*, 707 F.3d 1276, 1280 (11th Cir. 2013).

### LLOYD'S GROUNDS FOR SUMMARY JUDGMENT

#### 1. CONDUCT NOT COVERED

As its first ground for summary judgment, Lloyd's contends that Brasner, in the solicitation and sale to Glass, stepped beyond the role of an insurance broker and acted as a financial investments salesman. Brasner's error and omissions policy covers "Damages resulting from any Claim(s) . . . for any Wrongful Act of the Insured in the performance of or failure to

perform Professional Services . . . ." Under the policy, Professional Services are defined as "the marketing, sale or servicing of <u>insurance products</u> . . . ." (Emphasis added).

Rather than selling "insurance products," Lloyd's contends that Brasner was actually selling *investment* products, specifically stranger-originated life insurance financial instruments. While this contention may be true, it has not been developed adequately in the record. We know nothing of the back-and-forth between Brasner and Glass that led to Glass's decision to purchase life insurance from AXA. Lloyd's might have used Local Rule 56.1 in this effort, but it failed to do so. Its repetitive statements that the complaint alleged one fact or another do not satisfy the rule's requirements that facts be listed with citations to documents having evidentiary value. Therefore, the Court concludes that, on this issue, Lloyd's has failed to carry its burden of demonstrating an entitlement to summary judgment.

## 2. FALSIFICATION EXCLUSION

Lloyd's second ground for summary judgment is founded upon the falsification exclusion. Section II.A.2 bars coverage for claims

> based upon, arising out of, directly or indirectly relating to or in any way involving . . . Falsification of any offer of an insurance contract or document, including but not limited to quotes, binders, indications or policies.

Lloyd's contends the term "document" in the exclusion should be given its plain all-inclusive meaning, *viz.*, written or printed information used in the marketing, sale or servicing of insurance products. If correct, this would include insurance applications. GIII, on the other hand, argues that the term "offer of an insurance contract," which precedes the word "document" and the terms "quotes, binders, indications or policies" — albeit introduced by the phrase

6

"including but not limited to" — cabin the term "document" and narrow its definition to encompass only written or printed information emanating from the insurer listing significant aspects of proposed coverage. In support of this contention, GIII notes that the phrase "offer of an insurance contract" by its plain meaning points to a communication from the insurer. By the same token, Lloyd's own website defines a "quotation" as a "statement of the premium that an underwriter requires to underwrite an insurance/reinsurance risk based on the information supplied by the person seeking cover, either directly or via their broker." *Glossary*, Lloyd's: the World's Specialist Insurance Market, http://www.lloyds.com/common/help/glossary (last visited Nov. 6, 2013). Similarly, Lloyd's defines an "indication" as a "nonbinding statement by an underwriter of the likely level of premium that he would charge to underwrite a risk, subject to the provision of additional information." *Id.* The terms "binders" and "policies" also connote communications from the insurer. A "binder" is an "insurer's memorandum giving the insured temporary coverage while the application for an insurance policy is being processed or while the formal policy is being prepared." Black's Law Dictionary (9th ed. 2009). Similarly, an insurance "policy" is a "contract of insurance [or] document detailing such a contract." *Id.*

A careful evaluation of both proposed interpretations suggests that neither is unreasonable. They are, however, incompatible. Lloyd's interpretation will permit the invocation of the exclusion to deny coverage. GIII's interpretation renders the exclusion inapplicable to the facts of this case, thus allowing coverage. Faced with such a conflict, the Court has no hesitancy in finding the term "document," as used in the exclusion, ambiguous. Under Florida insurance law, if the "relevant policy language is susceptible to more than one reasonable interpretation, one providing coverage and the [ ] other limiting coverage, the

7

insurance policy is considered ambiguous." *Travelers Indemnity Co. v. PCR, Inc.*, 326 F.3d 1190, 1193 (11th Cir. 2003) (alteration in original) (quoting *Auto-Owners Ins. Co. v. Anderson*, 756 So. 2d 29, 34 (Fla. 2000)) (internal quotation marks omitted).

A finding of ambiguity requires the Court to resort to well-settled principles of insurance contract construction. "An ambiguous provision is construed in favor of the insured and strictly against the drafter." *Swire Pacific Holdings, Inc. v. Zurich Ins. Co.*, 845 So. 2d 161, 165 (Fla. 2003). "[E]xclusionary provisions which are ambiguous or otherwise susceptible to more than one meaning must be construed in favor of the insured, since it is the insurer who usually drafts the policy." *Id.* (alteration in original) (citation and internal quotation marks omitted). In this case, the canon of *noscitur a sociis* provides additional support to these principles for it holds that an ambiguous term may be given more precise content by the neighboring words with which it is associated. All of the terms Lloyd's elected to use in its falsification exclusion involve communications from the insurer to the client listing important aspects of the proposed insurance. Accordingly, the Court concludes that GIII's proposed interpretation is correct. As crafted by Lloyd's, the falsification exclusion is not triggered by a broker-falsified insurance application.

### C. CRIMINAL CONDUCT EXCLUSION

Lloyd's third basis for summary judgment is founded upon the "criminal conduct" exclusion. Section II.A.7 bars coverage for claims

> based upon, arising out of, directly or indirectly relating to or in any way involving . . . Conduct which is fraudulent, dishonest, criminal, willful, malicious, intentionally or knowingly wrongful, or otherwise intended to cause damage or injury to personal property; however, this exclusion shall not apply . . . unless there is

8

>a finding or adjudication in any proceeding of such conduct or an admission by an Insured of such conduct . . . .

Lloyd's contends that the entry-of-plea proceeding, followed by an adjudication of guilt in the Circuit Court for the Fifteenth Judicial Circuit of Florida, conclusively establishes that Brasner engaged in criminal fraud with respect to the AXA/Glass life insurance policies. Initially, in citing the quantum of proof that could be considered on this issue, Lloyd's urged the Court to evaluate the probable cause affidavit that led to Branser's arrest. That affidavit, however, is inadmissible hearsay that cannot be considered for summary judgment purposes. *See Jones v. UPS Ground Freight*, 683 F.3d 1283, 1293–94 (11th Cir. 2012); *see also Shepard v. United States*, 533 U.S. 13 (2005). Thus, the Court will limit its focus to what was said in Brasner's presence and to which he assented at the entry-of-plea proceeding. Also, the Court will consider Brasner's signed agreement listing the special conditions of probation. The statement of facts presented by the prosecutor, to which Brasner assented, indicates that Branser, between January 1, 2006 and December 31, 2007, engaged in an ongoing scheme to defraud multiple insurance companies, one of which was AXA, by providing materially false information on applications. A plea document, signed by Brasner and his attorney, listing various special conditions of probation was read into the record. Among other conditions, it stated, "No work in the insurance industry whatsoever. Defendant may continue to receive income from prior placed insurance renewal income. Excluded from renewal income [are] AXA policies for Walter & Geoffrey Glass, Altman, Gelch & Sciolino." (Emphasis in original). The totality of admissible evidence establishes conclusively that Brasner victimized AXA by making false and material misrepresentations on insurance applications. Furthermore, the statement of a special condition of probation which permitted Brasner to receive renewal income from "prior placed insurance,"

9

but prohibited him from receiving renewal income from the Walter & Geoffrey Glass AXA policies, demonstrates that the Glass policies were integral components of Brasner's scheme to defraud.

GIII, in an effort to satisfy its burden under *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), offered an excerpt from Brasner's deposition. When questioned about his understanding of the plea, Brasner responded, "I don't have an independent understanding because I'm not an attorney, and as I said, I let my attorney handle the day-to-day legal, technical plea arrangements. I don't have a legal understanding or even a general understanding of what the definition of it truly means." In short, Brasner professed to have no idea about what his plea encompassed. Thus GIII has failed to demonstrate the existence of a genuine dispute of a material fact. And the Court concludes that no reasonable jury could find that Brasner's plea and subsequent adjudication did not encompass the Glass applications and policies.

GIII, of course, asserts that it is not relying on any misrepresentations in the applications for life insurance, but rather on a "negligent misrepresentation" in the agent certificate. Recall that Brasner in the agent certificate stated that the information provided to AXA in the applications for life insurance was "to the knowledge of the Agent, true and accurate . . . ." In other words, Brasner merely repeated his prior fraudulent misrepresentation. As such, his certification to GIII was based upon and arose out of Brasner's fraudulent, criminal conduct for which he was adjudicated guilty. Consequently, the criminal conduct exclusion in Lloyd's professional error and omissions policy is operative and relieves Lloyd's of liability to Brasner and/or GIII.

## CONCLUSION

For the reasons set forth above, the Court concludes that Lloyd's has demonstrated its entitlement to summary judgment.

Accordingly, it is hereby

**ORDERED** and **ADJUDGED** that:

1. Plaintiffs' Certain Interested Underwriters at Lloyd's, London Motion for Final Summary Judgment [ECF No. 120] is **GRANTED**.  The Court will enter Final Judgment by separate order.

2. Defendant The GIII Accumulation Trust's Motion for Partial Summary Judgment on Coverage [ECF No. 117] is **DENIED.**

**DONE** and **SIGNED** in Chambers at West Palm Beach, Florida this 7th day of November, 2013.

Daniel T. K. Hurley
United States District Judge

*Copies provided to counsel of record*